FILED
2013 Nov-05  PM 04:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHELIA D. BLACKSHEAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV: 12-J-2596-S |
| | ) | |
| UNIVERSITY OF ALABAMA | ) | |
| HEALTH SERVICES | ) | |
| FOUNDATION, P.C., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

This case turns on the turning of a badge. Plaintiff Shelia Blackshear contends that her former employer, the University of Alabama Health Services Foundation, P.C. ("UAHSF") retaliated against her in violation of 42 U.S.C. §2000e-3(a) for having opposed what she perceived to be unlawful sexual harassment by her male supervisor.[1] Corrected Amended Complaint pp. 2-4 (doc. 12). Blackshear claims her supervisor inappropriately touched her breast under the guise of turning over her employee ID badge to show her picture and name. Now

_____

[1] Despite having submitted two amended complaints, portions of Plaintiff's Corrected Amended Complaint still name Kirkland Clinic [sic] as a defendant. Corrected Amended Complaint p. 2 (doc. 12). While Plaintiff's place of employment was Kirklin Clinic, Kirklin Clinic is not a legal entity. *See* Answer to Corrected Amended Complaint p. 4 (doc. 20). Rather, Plaintiff was hired by UAHSF to work in the Kirklin Clinic.

pending before the court are Defendant UAHSF's Motion for Summary Judgment (doc. 24) and brief and evidentiary support thereof (docs. 25 & 26), Plaintiff's response to Defendant's motion (doc. 30-1) and evidentiary support thereof (doc. 31-1), and Defendant's reply to Plaintiff's response (doc. 33). For the reasons discussed below, the court finds Defendant's motion is due to be granted.

## FACTUAL BACKGROUND

Blackshear is a certified medical assistant with a diploma from Fortis College, formerly known as Tri-State. Pl. Depo. pp. 28-29 (doc. 26-1).[2] As a certified medical assistant, Blackshear has also completed all National Health Career Association requirements and is a Certified Phlebotomy Technician (CPT), Certified Clinical Medical Assistant (CCMA), and a Certified EKG Technician (CET). *Id.* at 37. Currently a full-time student at Fortis, Blackshear is studying to become a medical lab technician and receives student loans to support herself. *Id.* at 30-31, 46-47. Since her termination, Plaintiff has also applied for several jobs. *Id.* at 137-38; 140-41 (doc. 26-2). At the time of her deposition, Plaintiff had received an email from one of the employers to which she had submitted an

---

[2] The cover letter included in Defendant's exhibit 4 (doc. 26-2) incorrectly states that Blackshear received her high school diploma from Central High School. Plaintiff claims her mother-in-law wrote the cover letter, but that all other factual assertions therein are true. Pl. Depo. pp. 37-38 (doc. 26-1). In looking at the aforementioned cover letter, however, Plaintiff was unable to recall whether or not she received her medical assistant certification on February 12, 2010, the date listed in the cover letter. *Id.* at 41.

application, but had not yet responded to the email. *Id.* at 137-38.

Blackshear began working for UAHSF on April 4, 2010. Pl. Depo. at 50 (doc. 26-1). UAHSF hired Plaintiff to work as a medical assistant in the cardiology department, and she kept that position throughout her employment there. *Id.* at 55. As a medical assistant, Blackshear's responsibilities were "[a]ssisting the patients, answering phones, EKGs, and injections." *Id.* at 56. Donna Dye served as Procedure RN Supervisor and Blackshear's supervisor at the time of Blackshear's termination. *Id.* at 57; Dye Aff. p. 1 (doc. 26-4). On September 6, 2011, Defendant hired Tami Kizer as the Cardiology Clinic Team Leader, and Kizer thereafter supervised Blackshear as well. Kizer Aff. p. 1 (doc. 26-6). Kimberly Turnley became the Interim Senior Director of Medicine Clinics in October 2011, but prior to that had no knowledge of Blackshear. Turnley Aff. pp. 1-2 ¶ 3 (doc. 26-7).

Blackshear had been instructed to wear her ID badge such that her name and picture were visible. Pl. Depo. p. 73 (doc. 26-1). A little over a year into her employment, however, Plaintiff's badge sparked the incident that forms the basis of her lawsuit. On May 18, 2011, Plaintiff filed a complaint with UAHSF describing the alleged harassment she experienced as follows:

> . . . [A]s I was walking through the Triage area [the physician] reached
> out and toched [sic] my badge and turned it over. I wear my badge on
> my left side where my breast is and to turn my badge over you have to

touch my breast to do so I thought it was very inappropriate behavior and the rule states if anything needs to be adressed [sic] it is to be adressed [sic] verbally And written.

Written Complaint of Shelia Blackshear to UAHSF, Def. Ex. 7 (doc. 26-3). In her deposition, Plaintiff confirmed that the written complaint was a true and accurate statement about that day's incident. Pl. depo. p. 72 (doc. 26-1). Plaintiff also testified that the doctor made no sexual comments to her when he flipped her badge.[3] *Id.* at 73. Plaintiff testified that another employee was in the area at the time of the incident. *Id.* at 154-55 (doc. 26-2). Plaintiff further admitted that the physician had not made any sexual comments to Plaintiff before the incident. *Id.* at 102. Blackshear testified that to her knowledge her name and picture were visible when the doctor flipped her badge. However, she also stated that "maybe if I was walking by maybe it flipped back over on the other side. I'm not sure." *Id.* at 74-75. The physician touched Blackshear neither before nor after the badge-turning episode, and Plaintiff agreed that this was an isolated incident.[4] *Id.* at 77.

---

[3] In her EEOC Intake Questionnaire, Plaintiff wrote that the physician "touched [her] breast as he stated he was just turning over [her] badge." EEOC Intake Questionnaire p. 2, Def. Ex. 14 (doc. 26-3). Plaintiff testified in her deposition, however, that she erred in making that statement and that the physician said nothing to her during the incident. Pl. Depo. pp. 168-170 (doc. 26-2).

[4] In a memo concerning the badge-turning incident, Jeannie Singer noted that Blackshear had reported that the same day of the incident, the same physician approached her later and asked her to turn over her ID badge. Memo of May 26, 2011 RE: Summary of Discussion/Follow-up (doc. 26-3 p. 14). However, in her deposition Blackshear testified that this was incorrect, but that the physician asked another employee to turn over her badge. Pl. Depo. pp. 127-128 (doc. 26-2).

After Blackshear reported the incident to Dye, Dye instructed her to talk to a Human Resources representative about the episode. *Id.* at 78. Plaintiff testified that she did not recall the name of the HR employee she spoke with, but Jeannie Singer, UAHSF's Director of Sourcing & Workforce Development, handled the complaint. Singer Aff. p. 1 (doc. 26-5). In response to Blackshear's complaint, Singer followed up with the physician who then offered to apologize to Blackshear. Memo of May 26, 2011, Def. Ex. 11 (doc. 26-3).[5] Blackshear stated that she did not want to meet with the physician, because an apology was insufficient. Rather, Blackshear stated that she did not feel comfortable working with the physician any longer. *Id.* After speaking with the physician, Singer determined that his actions were inadvertent and non-sexual. Singer Aff. pp. 2-3 ¶ 8 (doc. 26-5). Nonetheless, during the course of Singer's investigation, Dye temporarily re-assigned Blackshear to a different hallway. Memo of May 26, 2011, Def. Ex. 11 (doc. 26-3) Singer also offered Blackshear the option of applying for a transfer if she felt such transfer was necessary. In her memo to Blackshear, Singer also noted that over the course of the investigation, Blackshear's description of the incident changed from "he turned over my ID badge" to "I guess he got his feel."

---

[5] While Blackshear disputed the portion of Singer's memo stating that the physician asked Blackshear to turn her badge later that same day, *see supra* n. 4, Blackshear admitted that the remainder of the memo was accurate. Pl. Depo. p. 128 (doc. 26-2).

Singer offered Blackshear a counseling session at The Resource Center, which Blackshear accepted. Concluding that this was an isolated incident and the clinic had acted to insure that the incident would not be repeated, Singer determined that the appropriate steps had been taken to wrap up the incident. Singer reiterated that Blackshear could apply for a transfer if she felt it was necessary. *Id.*

Blackshear claims that she asked Dye about transferring as well, to which Dye responded that Blackshear should submit applications for other positions on the computer. Pl. Depo. pp. 82-83 (doc. 26-1).[6] Blackshear claims that she submitted applications for other medical assistant positions available inside the clinic, and that she felt that she should have been able to transfer. *Id.* at 83. Blackshear did not receive the transfers she applied for as the employer desired more qualified candidates. *Id.* at 84. According to the UAHSF employee handbook, employees seeking a transfer must first submit an application in the UAHSF Employment Office or online. UAHSF Employee Handbook Excerpt, Def. Ex. 9 (doc. 26-3). Moreover, the Employment Office makes decisions on whether to transfer employees based on "job-related qualifications, work history,

---

[6] Kizer claims that she had no knowledge of Blackshear's complaint until after Blackshear's termination. Kizer Aff. p. 4 ¶ 9 (doc. 26-6). Similarly, Turnley claims that she was unaware of Blackshear's harassment complaint until after Blackshear's termination. Turnley Aff. p. 4 ¶ 9 (doc. 26-7).

etc." *Id.*

Plaintiff received two formal disciplinary notices during her employment with UAHSF. Dye Aff. p. 2 ¶ 4 (doc. 26-4). On February 3rd, Plaintiff received a memorandum from Dye concerning inappropriate behavior in front of patients. Memo Re: Verbal Counseling – Behavior, Def. Ex. 10 (doc. 26-3). In that memo, Dye noted that a patient complained of an inappropriate conversation clinic staff had in his presence and that Blackshear's "participation in an unprofessional conversation was reported as part of the complaint." *Id.* According to Dye, the patient requested Blackshear's immediate dismissal. Dye Aff. p. 2 ¶ 4 (doc. 26-4). Blackshear testified that though she was not involved in the conversation, she was present when the conversation took place. Pl. Depo. p. 93 (doc. 26-2). Plaintiff then received a second memorandum from Dye on April 15, 2011, which noted that Plaintiff had declined to assist a physician in retrieving prescription pads, opting to remain on the computer instead. Memo Re: Summary Expectations for Job Performance, Def. Ex. 10 (doc. 26-3). Blackshear testified that she was unable to retrieve the prescription pads because they were in a locked closet, to which she had no key. Pl. Depo. p. 95 (doc. 26-2). Plaintiff claimed she did not attempt to retrieve the key to open the closet because she thought someone else would do so. *Id.* at 96. Blackshear also claims that she was not on the computer, but was instead

"running around getting different charts for the physicians." *Id.* at 98. Plaintiff claims that she told Dye the preceding information, but that she signed the disciplinary memo anyway because Dye told her that she still had to do so. *Id.* According to Kizer, Blackshear also repeatedly failed to input patient information in a timely manner. Kizer claims that when she verbally reprimanded Blackshear about this behavior, Blackshear responded that she did not have time to input the information. Kizer Aff. p. 2 ¶ 3 (doc. 26-6).

In October 2011 Kizer informed Dye that Blackshear "was failing to perform her job responsibilities and was not following proper documentation procedures. Specifically, . . . Blackshear was not downloading and delivering EKG records and was not properly completing flu consent forms." Dye Aff. p. 4 ¶ 10 (doc. 26-4). Dye, Kizer, and Turnley met with Blackshear on October 19, 2011, to discuss her performance issues. *Id.* at ¶ 11. Turnley claims that she, Dye and Kizer discussed specific examples of Blackshear's misconduct with her at the meeting. Turnley Aff. p. 2 ¶ 5 (doc. 26-7). According to Dye, Blackshear did not provide any acceptable explanations for her behavior. When asked about her failure to download and deliver EKG records, Blackshear simply responded "Honestly, sometime we do it, sometime we don't." Dye Aff. P. 4, ¶ 11 (doc. 26-4). Turnley decided to terminate Blackshear, and Kizer and Dye agreed with that decision.

Dye Aff. p. 5 ¶ 12 (doc. 26-4); Kizer Aff. p. 4 ¶ 8 (doc. 26-6); Turnley Aff. p. 3 ¶ 7

(doc. 26-7).  UAHSF then terminated Blackshear on October 20, 2011. Pl. Depo.

p. 58 (doc. 26-1). Blackshear recalls that in the meeting to discuss her termination,

her supervisors mentioned issues with "the seventy-five EKGs that weren't done"

as well as Blackshear's pre-signing flu shot consent forms. Pl. Depo. pp. 118, 121-

22. According to Kizer, pre-signing flu consent forms poses serious problems to

patient safety because before giving the shot, the "the person giving the shot has

no knowledge of the vaccination lot number, patient allergies, or any other

information needed to ensure patient safety." Kizer Aff. p. 3 ¶ 5 (doc. 26-6).

Additionally, Kizer claims that Blackshear also entered incomplete information on

flu consent forms, which "lacked vital information, including the location of the

injection, the patient's allergies, and the vaccination lot number." *Id.*

Subsequently, Blackshear received a letter from senior director Kimberly

Turnley confirming her termination. Pl. Depo. p. 58-59 (doc. 26-1). The letter

stated, in pertinent part, "this decision was reached based on your lack of

demonstrating ownership with protocol and patient safety requirements. Specific

examples were discussed with you. Prior to the termination meeting, the issues and

expectations for compliance had been discussed with you. Your continued

disregard for patient safety practices could not be tolerated." Letter of October 20,

2011, from Kimberly Turnley to Shelia Blackshear, Def. Ex. 6 (doc. 26-3). When asked in her deposition if there was anything in the letter that she perceived to be inaccurate, Blackshear responded "No." Pl. Depo. p. 60 (doc. 26-1). Plaintiff testified that she felt she was terminated for "going to HR and telling the supervisor that [a doctor] touched [her] inappropriately." *Id.* at 62.

Blackshear filed a charge of discrimination with the EEOC on December 15, 2011. EEOC Charge of Discrimination, Def. Ex. 5 (doc. 26-2).

## STANDARD OF REVIEW

A court may grant a movant's motion for summary judgment "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). An issue is "material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

In determining whether to grant the motion, the court must view "the

evidence and all reasonable inferences from that evidence. . . in the light most

favorable to the nonmovant." *Jean-Baptiste*, 627 F.3d at 820 (11th Cir. 2010);

*Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). However, the court need

only draw those inferences "to the extent supportable by the record." *Penley v.*

*Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372,

381 n. 8 (2007)). Once met by the moving party, the burden shifts to the

non-moving party to come forward with evidence to establish each element

essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d

1077, 1080 (11th Cir. 1990).

Moreover, "a party opposing a properly supported motion for summary

judgment may not rest upon mere allegations or denials of his pleading, but must

set forth specific facts showing that there is a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In addition, the non-moving party's

evidence on rebuttal must be significantly probative and not based on mere

assertion or be merely colorable. *Id.* at 249-50. "Speculation does not create a

*genuine* issue of fact." *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1181 (11th Cir.

2005).

**DISCUSSION**

A plaintiff makes a prima facie case of retaliation by showing: "that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (citing *Wideman v. Wal-Mart Stores, Inc.* 141 F.3d 1453, 1454 (11th Cir. 1998)). To establish that she engaged in statutorily protected activity, "a plaintiff must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citation omitted). A plaintiff demonstrates a reasonable, good faith belief in an employer's unlawful employment practices by showing that "(1) he subjectively believed in good faith that [the employer's] behavior was discriminatory, and that (2) his belief was objectively reasonable in light of the facts and record presented." *Mulkey v. Bd. of Cmmrs. of Gordon Cty.*, 2012 WL 3655629 at *4 (11th Cir. 2012) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008)). Whether an employee's belief is objectively reasonable "must be measured against existing substantive law." *Id.* (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

12

Pursuant to substantive sexual harassment law, a plaintiff alleging such discrimination must demonstrate the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Moreover, the plaintiff must show that the alleged conduct was both subjectively and objectively offensive:

> The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

*Id.* at 1246 (citations omitted). In determining whether the alleged harassment is severe or pervasive, the court considers: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

13

work performance." *Harris v. Florklift Systems*, Inc., 510 U.S. 17, 23 (1993).

Additionally, the plaintiff seeking to establish retaliation in the employment discrimination context faces the hurdle of showing that the protected activity was the but-for cause of the discrimination. The Supreme Court has indicated that to make out retaliatory discrimination against an employer, the plaintiff must establish that the retaliation would not have occurred but for the plaintiff's exercise of her rights. *See University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013). In *Nassar*, the Court determined that the "but-for" causation test set out for ADEA discrimination claims in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), applies equally to Title VII retaliation claims. *Id.* The Court reasoned that where a plaintiff attempts to show that she was discriminated against because she engaged in some protected activity under Title VII, she must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.

Plaintiff argues that but-for cause does not mean sole cause, relying on *Pearson v. Lawrence Medical Center*, 2012 WL 5265774 (N.D. Ala. 2012). Pl. Resp. in Opposition to Def.'s Motion for Summary Judgment p. 21 (doc. 30-1). That case, however, dealt with whether a plaintiff may submit a claim of

14

discrimination under the ADEA's but-for causation scheme while arguing at the same time that she was subjected to other types of discrimination as well. *Id.* at *4 (noting court disagreement over whether a plaintiff may pursue ADEA and other discrimination claims following *Gross*). Here, Plaintiff's only argument is sexual harassment. Thus, the but-for causation standard still requires Blackshear to show that she would not have suffered the alleged retaliation had she not engaged in protected activity. *Nassar*, 133 S. Ct. at 2533 (2013).

Accordingly, Blackshear's retaliation claim fails for two reasons. First, Blackshear cannot demonstrate that she engaged in statutorily protected activity. Second, even assuming that Blackshear could demonstrate that she engaged in statutorily protected activity, she cannot demonstrate that her termination was causally related to her complaint.[7]

---

[7] Looking at the Corrected Amended Complaint and Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff appears to be arguing that the retaliatory act was her termination, not Defendant's failure to transfer her to another department. Indeed, in the complaint, Plaintiff states that she "was terminated for reporting and opposing sexual harassment." Corrected Amended Complaint p. 3 (doc. 12). Moreover, in Plaintiff's Response to Defendant's Motion for Summary Judgment, she cites the failure to transfer her as an example of Defendant's retaliatory animus. Pl.'s Resp. p. 22 n. 3. Even if Plaintiff had alleged that Defendant's failure to transfer her constituted retaliation under Title VII, that argument fails, because UAHSF's failure to transfer Blackshear did not constitute an adverse employment action. Under *Chapman v. U.S. Postal Service*, 442 Fed. Appx. 480, 484 (11th Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)), "[w]ith regard to a retaliation claim, a plaintiff must show that 'a reasonable employee would have found the challenged action materially adverse, which. . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." UAHSF's act of giving Blackshear instructions on how to apply for a transfer, without more, would not have dissuaded a

First, Blackshear cannot demonstrate that she engaged in statutorily protected activity, because her belief about her employer's unlawful practice is not objectively reasonable in light of the facts and record presented or as measured against substantive law. Although Blackshear claims that the physician's act was severe and unreasonably interfered with her work performance, the conduct was not frequent and cannot be objectively seen as physically threatening or humiliating. The pith of Blackshear's sexual harassment complaint was the isolated incident of the physician touching her breast while turning over her badge. Even taking as true Blackshear's contention that her badge displayed her name and picture prior to the physician touching it, this one isolated incident does not constitute sexual harassment as defined by the canon of Title VII cases.[8]

---

reasonable employee from making a charge of discrimination. Blackshear's terms and conditions of employment did not change as a result of UAHSF's decision not to transfer her; she received no demotion or pay decreases and held the same job duties and responsibilities. Indeed, Blackshear filed a complaint with the EEOC and instituted the lawsuit at hand. The court also notes that Plaintiff incorrectly reads Defendant's transfer policy to permit an exception to the general requirement that employees seeking transfers submit applications online. *See* Pl.'s Resp. p. 10 ¶ 9 (doc. 30-1). Rather, the policy provides that "[i]n the event of a promotion, salary increases should not exceed the midpoint of the range for the new position. Any exception to *this policy* will require a letter of justification and approval by the departmental administrator and coordinated with the Human Resources Department." UAHSF Employee Handbook Excerpt, Def. Ex. 9 (doc. 26-3 p. 11) (emphasis added). The handbook, thus, provides an exception to midpoint salary increases.

[8] Plaintiff's response cites various cases in support of her assertion that a single incident may support a finding of sexual harassment. However, those cases are factually distinct from Plaintiff's and do not weigh in her favor. For instance, Plaintiff states that *Durkin v. City of Chicago* provides that "a single incident that constitutes a sexual assault may be sufficiently

Blackshear admitted in her deposition that the physician did actually turn over her badge as he touched her breast, and this conduct is simply neither severe or physically threatening. Moreover, Blackshear admitted that the physician never said anything sexual to her before, during, or after the incident. Blackshear also testified that the incident occurred in the hallway, a public area, and that another employee was there at the time.

Even accepting Blackshear's allegation that the physician intended to touch her breast, that one isolated act does not rise to the level of severe or pervasive conduct under Title VII. For example, in *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir. 1999), the Eleventh Circuit found that the supervisor's alleged behavior was insufficient to amount to severe conduct where there was one instance of physical conduct, the supervisor allegedly followed the employee around the office, and the supervisor looked at the employee's crotch, sniffed and said "I'm getting fired up." *See also Lockett v. Choice Hotels Int'l, Inc.*, 315 Fed. Appx. 862, 866 (11th Cir. 2009) (finding that sexual remarks and two instances of

---

severe to constitute sexual harassment." Pl.'s Resp. in Opposition to Def.'s Motion for Summary Judgment p. 15 (doc. 30-1). However, the court in *Durkin* actually held that the supervisor's act of exposing himself and urinating in front of the plaintiff and asking her to "suck it", while "vulgar and boorish,. . . was not particularly severe." *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 850-51 (N.D. Ill. 2002). The court further explained that "[a] single incident of indecent exposure that does not constitute a sexual assault is generally insufficiently severe to constitute sexual harassment." *Id.* at 851.

brief touching, including supervisor's alleged touching of employee's bottom, did not amount to severe behavior). *Cf. Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (finding severe or pervasive behavior where supervisor harassed employee at least 18 times in two weeks, directly and indirectly propositioned employee for sex, followed her into the restroom, and repeatedly tried to touch her breasts, put his hand in her pants, and pull her pants down).

Second, even if Blackshear could establish that she engaged in statutorily protected activity, she cannot demonstrate that her having complained of the physician's behavior was causally related to her supervisor's decision to terminate her. More specifically, Blackshear cannot establish that her complaint about the physician's action was the but-for cause of her termination. Kizer and Turnley both swore that neither had knowledge of Blackshear's sexual harassment complaint at the time they made the decision to terminate her. Moreover, Kizer and Dye swore that it was Turnley's decision to terminate Blackshear, a decision with which they agreed. Kizer, Turnley and Dye repeatedly referenced independent bases for their decision to terminate Blackshear. Blackshear admitted that her supervisors discussed both the EKG and pre-signed flu consent forms issues with her in the meeting during which she was terminated. Further, the

18

record includes the two prior disciplinary notices to Blackshear concerning her behavior. Blackshear's termination came about five months after she lodged her complaint, and this time frame is not so short as to clearly demonstrate a causal link between the complaint and the termination where all other causal indicators are lacking.

Plaintiff also argues that other similarly situated employees who did not make sexual harassment complaints were treated differently than Plaintiff. Generally, comparisons of similarly situated employees go to show pretext.[9] Plaintiff, however, claims that this evidence supports the causal connection between Plaintiff's action and her termination. Pl.'s Resp. in Opposition to Defendant's Motion for Summary Judgment p. 21 (doc. 30-1). To support this allegation, Plaintiff points to a list of disciplinary actions taken towards Defendant's employees. Pl. Ex. 1 (doc. 31-1). Plaintiff claims that this list demonstrates that other employees who worked under Dye committed infractions worse than Plaintiff's but were not terminated. Specifically, Plaintiff claims that Defendant terminated neither John Alan Doughy who "shot [a] bird behind dr's

_____

[9] *See, e.g.*, *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) (a plaintiff may show pretext by establishing "(1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated").

back," nor Lakisha Thomas, who had "unacceptable behaviors in clinic," had a "rude attitude," and time and attendance issues. Pl.'s Resp. p. 21 (doc. 30-1); Pl. Ex. 1 (doc. 31-1).

The court notes that the list only displays the two formal disciplinary notices Blackshear received. The list does not include the later issues involving the EKG downloads and pre-signed incomplete flu consent forms, infractions Blackshear admitted having committed. Moreover, Turnley and Kizer both indicated that Blackshear's pre-signing of flu forms presented a serious patient safety issue. Thus, the court is not convinced that Doughy and Thomas's misconduct was unquestionably more serious than Blackshear's. The court does not sit as a super-personnel department, and it is not the court's role to second-guess the wisdom of an employer's business decision, as long as those decisions were not made with a discriminatory motive. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

## **CONCLUSION**

Having considered the foregoing, and being of the opinion that the Defendant's motion for summary judgment is due to be granted on all of the Plaintiff's claims, the court shall grant said motion by separate Order.

**DONE** and **ORDERED** this 5th day of November 2013.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE